UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION, :

                     Plaintiff,            :        15 Civ. 7077 (GBD) (GWG)

   -v.-                             :        <u>OPINION AND ORDER</u>

STEPHEN B. PENCE,              :

                     Defendant.        :

------------------------------------------------------------------X

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

The Securities and Exchange Commission ("SEC") has sued Stephen B. Pence for

allegedly violating federal securities laws in connection with a scheme to defraud General

Employment Enterprises, Inc. ("GEE") and its investors in 2009 and 2010. Both the SEC and

Pence seek to depose Gregory Bartko, an inmate at the Coleman Federal Correctional Institution

in Sumterville, Florida. Bartko has moved to invoke his Fifth Amendment privilege against self-

incrimination.[1] For the reasons set forth below, Bartko's motion is granted in part and denied in

---

[1] See Memorandum in Support of Non-Party Witness Gregory Bartko's Invocation of His Privilege Under the Fifth Amendment to the United States Constitution, filed Aug. 7, 2017 (Docket # 55) ("Bartko Mem."); Memorandum in Response to Non-Party Gregory Bartko's Invocation of His Privilege Under the Fifth Amendment to the United States Constitution, filed Aug. 8, 2017 (Docket # 57) ("Def. Mem."); SEC'S Memorandum of Law in Response to Gregory Bartko's Memorandum to Invoke the Privilege Against Self-Incrimination Under the Fifth Amendment to the United States Constitution, filed Aug. 8, 2017 (Docket # 58) ("SEC Mem."); Reply in Support of Non-Party Witness Gregory Bartko's Invocation of His Privilege Under the Fifth Amendment to the United States Constitution, filed Aug. 17, 2017 (Docket # 65) ("Bartko Reply"); Defendant's First Supplemental Memorandum in Further Opposition to Non-Party Gregory Bartko's Motion to Invoke the Fifth Amendment, filed Sept. 12, 2017 (Docket # 73) ("Def. First Supp. Mem."); SEC's Supplemental Letter to the Court, filed Sept. 12, 2017 (Docket # 74) ("SEC First Supp. Letter"); SEC's Second Supplemental Letter to the Court, filed Sept. 28, 2017 (Docket # 77) ("SEC Second Supp. Letter"); Defendant's Second Supplemental Memorandum in Further Opposition to Non-Party Gregory Bartko's Motion to Invoke the Fifth Amendment, filed Sept. 28, 2017 (Docket # 80) ("Def. Second Supp. Mem."); Non-Party Witness, Bartko's Response to the Parties' Supplemental Memoranda Addressing Invocation of

part.

I.  BACKGROUND

Bartko seeks to invoke his privilege against self-incrimination with respect to two distinct sets of facts: (I) the conduct underlying his prior criminal conviction, including the related arrest, trial, sentencing, and post-sentencing proceedings; and (ii) his role in the scheme alleged in the complaint.

A.  Bartko's Criminal Conviction and Related Matters

In his memorandum of law, Bartko states that his prior criminal conduct and all related proceedings stem from his management of two private equity funds in 2004 and 2005: the Caledonian Fund and the Capstone Fund.  See Bartko Mem. at 3-8.

According to Bartko, in 2004, he was a "securities lawyer and securities dealer" and managed the Caledonian Fund alongside his partner Darryl Laws.  See Bartko Mem. at 3-5.  An individual named James K. Colvin agreed with Bartko to raise $3 million in investments for the Caledonian Fund.  See id. at 4.  Colvin's source of funding was the fraudulent investment activities of an individual named Scott Hollenbeck.  See id.  Bartko's law firm also represented Hollenbeck in an SEC civil enforcement proceeding.  See id. at 4.  In October 2004, the Caledonian Fund was "shuttered" after Colvin's $3 million commitment proved "hollow."  Id. at 5.

In November 2004, Bartko started another private equity fund, the Capstone Fund.  See Bartko Mem. at 3, 5.  Bartko arranged for Hollenbeck to refer potential investors to the fund

the Fifth Amendment Privilege, filed Sept. 29, 2017 (Docket # 81) ("Bartko Supp. Response"); Gregory Bartko's Reply Letter to the Court, filed Oct. 6, 2017 (Docket # 82) ("Bartko Supp. Reply").

from November 2004 through January 2005, even though Hollenbeck was prohibited by law from directly selling investments as a result of the civil enforcement action against him. See id. at 5-6. The Government contended that "[b]etween December 21, 2004, and January 10, 2005, a total of $1,156,125 from 18 different victims was deposited into accounts controlled by Hollenbeck, and the exact same amount was transferred by Hollenbeck to Bartko's account." See Brief for Appellee at 15, United States v. Bartko, 728 F.3d 327 (4th Cir. 2013), cert. denied, 134 S. Ct. 1043 (No. 12-4298). In Bartko's view, after "problems developed in the manner that Hollenbeck forwarded investor funds and subscription documents," Bartko sought to refund $1 million to investors, but Hollenbeck devised a scheme to embezzle or otherwise retain these funds. See Bartko Mem. at 6. Bartko claims to have later refunded approximately 94% of these investments after being confronted by an SEC attorney in March 2005. See id.

In connection with these activities, Bartko was tried and convicted in the United District Court for the Eastern District of North Carolina for "conspiracy to commit mail fraud, selling unregistered securities, engaging in money laundering . . . unlawful monetary transactions . . . [four counts of] mail fraud and aiding and abetting . . . [and] selling unregistered securities and aiding and abetting . . . ." Sentencing Transcript for Gregory Bartko in United States v. Bartko, No. 5:09 Cr. 321-D-1 (annexed as Ex. C to the Declaration of Nicholas A. Pilgrim, filed Aug. 8, 2017 (Docket # 59) ("Pilgrim Decl.")) ("Sent. Tr."), at 4. Bartko had testified at trial, and the sentencing judge found that Bartko gave "false, material, perjurious" testimony that was "intended to obstruct justice." Id. at 89. The judge added an obstruction enhancement to Bartko's sentencing guidelines calculation. Id.

After trial, Bartko filed four motions for a new trial. See Bartko, 728 F.3d at 334. These motions contained claims that the government failed to turn over exculpatory and impeachment

3

evidence, that the government permitted Hollenbeck to testify falsely, that the trial court erred in considering an ex parte sealed document the government submitted, that the trial court erred in failing to give jury instructions regarding multiple conspiracies and accomplice liability, and that the trial court improperly computed Bartko's sentencing range under the Sentencing Guidelines. See id. at 334-47. All of these motions were denied by the district court. See id. at 331. The Fourth Circuit affirmed Bartko's conviction and sentence. See id. at 347.

Bartko thereafter filed a motion to vacate the trial court's judgment pursuant to 28 U.S.C. § 2255. See Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 in Gregory Bartko v. United States, No. 5:09 Cr. 321-D-1 (E.D.N.C. Jan. 26, 2015) (Docket # 292) ("Bartko Mot. to Vacate"). In that petition, Bartko seeks to vacate his judgment of conviction based on "various instances of prosecutorial misconduct and the presentation of false and misleading evidence," id. at 1, including failures to produce notes of witness interviews and exculpatory documents, id. at 13-43. This motion is still pending and Bartko asserts that "it is possible, and perhaps even likely, that Bartko may testify in further support of his claims" at an evidentiary hearing held in his habeas proceeding. Bartko Mem. at 12. While Bartko does not mention it, we note also that if the judgment of conviction were vacated, a new trial would potentially be held and the Government would be able to use any statements Bartko made in a deposition in the instant case against him as evidence in the new trial.

B. SEC's Civil Suit Against Pence

On September 9, 2015, the SEC filed the complaint in this action accusing Pence of various securities law violations between July 2009 and November 2010. See Complaint, filed Sept. 9, 2015 (Docket # 1) ("Compl."), ¶ 1.

The SEC's complaint alleges that on July 1, 2009, PSQ, LLC ("PSQ") acquired a

4

majority interest in GEE by means of a securities purchase and tender offer agreement.  See id. ¶¶ 2, 27.  Although Pence allegedly owned PSQ in its entirety, the SEC claims that Pence in fact owned PSQ on behalf of a convicted felon named Wilbur Anthony Huff, and that Pence acted as Huff's agent.  See id. ¶¶ 2, 23, 28, 32.  The purpose of this arrangement was to circumvent "legal and practical barriers [preventing Huff from] operating business entities in his own name," inasmuch as Huff was a convicted felon who could not operate the company in his own name. Id. ¶ 17.  This arrangement persisted until "November 17, 2010, when [Pence] transferred his 100% interest in PSQ to another Huff associate, who, like Pence, paid no consideration to become PSQ's nominal owner."  Id. ¶ 14.  Entities affiliated with Huff had provided PSQ with the money to purchase GEE.  See id. ¶¶ 28, 31.

After GEE's acquisition, Huff carried out a fraudulent scheme to have GEE transfer $2.3 million from GEE's checking account to an entity owned by the President of Park Avenue Bank ("PAB"), Charles J. Antonucci, Sr., with whom Huff allegedly had prior business dealings.  Id. ¶¶ 4-5, 18.[2]  As part of its acquisition of GEE, PSQ caused $1,925,000 to be deposited in an account for GEE at PAB.  See id. ¶ 35.  Also, after PSQ acquired GEE, Pence and then Huff gained the ability to appoint three of GEE's five directors.  See id. ¶¶ 2, 27, 32.  Pence appointed himself chairman of the board, appointed two other directors, and then selected Ronald E. Heinemen, to whom Huff had directed "substantial monthly payments," as GEE's CEO.  See id. ¶¶ 20, 27.  GEE then deposited an additional $750,000 from its other bank accounts into its PAB account.  See id. ¶ 35.  In July 2009, $2.3 million of the funds in GEE's PAB account were allegedly withdrawn.  See id. ¶ 38.  Heinemen claimed that these funds were

---

[2]  PAB closed in 2010 and the Federal Deposit Insurance Corporation was named as the receiver.  See Compl. ¶ 18.

invested in a certificate of deposit at PAB, when in fact they were transferred to Park Avenue Insurance, another entity owned by Antonucci. See id. ¶¶ 5, 38-41. Entities affiliated with Huff ultimately returned the same amount to GEE's PAB account after an outside audit committee investigated the funds' disappearance. See id. ¶¶ 5, 48-53.

The SEC accuses Pence of, inter alia, making a series of false or materially misleading claims to GEE's outside auditor during GEE's 2009 fiscal year end audit, and of otherwise withholding information material to the audit. Id. ¶¶ 1, 6, 48, 51, 53, 57, 63, 65. More specifically, the SEC alleges that Pence signed a 2009 Form 10-K on January 8, 2010, containing false statements of fact, including, inter alia, that the $2.3 million withdrawn from GEE's account was used to buy a certificate of deposit from PAB, see id. ¶¶ 1, 7, 66-67, and that GEE retrieved this money "through a non-recourse assignment of the CD for face value to an unrelated party." Id. ¶ 7. The SEC also accuses Pence of misrepresenting in certain securities filings the source of PSQ's funding to acquire GEE. See id. ¶ 29.

C. Procedural History

On April 26, 2017, Pence filed a motion seeking leave to depose Bartko in connection with this matter. See Notice of Motion of Defendant Stephen B. Pence for Leave to Depose Inmate Gregory Bartko, filed Apr. 27, 2017 (Docket # 39) ("Leave Mot."). Pence alleged that Bartko "represented PSQ in connection with its purchase of shares in GEE," and that Bartko served as GEE's general counsel from on or about October 13, 2009, through November 19, 2010. See Memorandum of Law in Support of Defendant's Motion for Leave to Depose Inmate Gregory Bartko, filed Apr. 27, 2017 (Docket # 41), at 2. Pence alleged that Bartko advised him regarding "the disclosures he needed to make in connection with PSQ's acquisition of GEE and immediately thereafter . . . . [and] how GEE's excess funds should be invested." Id. at 4. Pence

6

also asserted that Bartko helped investigate the disappearance of the $2.3 million from GEE's bank account.  Id.

This Court ordered Bartko to send a letter to the parties explaining his objections, if any, to being deposed.  See Order, filed Apr. 26, 2017 (Docket # 38).  Bartko responded that he had no objections, but sought to reserve his right to claim "any appropriate attorney-client privilege during my deposition which may be required under the law, as well as any other relevant evidentiary privileges."  Letter from Gregory Bartko, filed May 11, 2017 (Docket # 43).  This Court granted Pence's motion on May 15, 2017.  See Memo Endorsement of Notice of Motion of Defendant Stephen B. Pence for Leave to Depose Inmate Gregory Bartko, filed May 15, 2017 (Docket # 44) ("Leave Memo Endorsement").

On July 14, 2017, this Court received a letter written by Bartko, which stated that Bartko would "declin[e] to submit to any testimonial deposition in any pending civil or criminal matter until [his] Habeas Petition is fully litigated."  Letter from Gregory Bartko (annexed as Ex. A to the SEC's Letter to the Court, filed July 14, 2017 (Docket # 49)), at 1.  The Court thereafter instructed the SEC and Pence to submit letters to Bartko and his habeas attorney containing a list of potential areas of questioning.  See Order, filed July 14, 2017 (Docket # 50), at 1.  The Order further specified that if Bartko intended to refuse to answer questions relating to any of these topics, he should submit a letter or memorandum of law to this Court setting forth his legal arguments for such refusals.  See id.

Pence and the SEC submitted their proposed topics to Bartko shortly thereafter.  See Letter from SEC to Gregory Bartko and Don Samuel Re: July 14, 2017 Order Re: Deposition of Federal Inmate Gregory Bartko (annexed as Ex. A to Pilgrim Decl.) ("SEC Proposed Topics"); Letter from Stephen B. Pence to Gregory Bartko (annexed as Ex. A to the Declaration of Alan S.

Lewis in Response to Gregory Bartko's Invocation of his Fifth Amendment Privilege, filed Aug. 8, 2017 (Docket # 56) ("Lewis Decl.")) ("Pence Proposed Topics"). Bartko then filed a memorandum of law in which he argued that he may refuse to answer deposition questions by either party relating to all of the proposed topics "[e]xcept for general biographical information, Bartko's relationship with Mr. Pence or any other former client named in the SEC Complaint, and the identity of such former clients . . . ." Bartko Mem. at 20.

The topics submitted by Pence and the SEC consist almost entirely of topics relating to Bartko's dealings with Pence, PSQ, and GEE at the time of the alleged fraudulent conduct. See SEC Proposed Topics; Pence Proposed Topics. In addition, the SEC added that it wished to question Bartko on his Eastern District of North Carolina "criminal trial, conviction, and sentencing," as well as his "lawsuits against, and views towards, federal agents or agencies, including the SEC." SEC Proposed Topics at 2. Bartko responded to these filings with another memorandum of law. See Bartko Reply. The Court thereafter ordered additional briefing on the issue of the applicable statute of limitations. See Order, filed Sept. 5, 2017 (Docket # 72); Def. First Supp. Mem.; SEC First Supp. Letter; SEC Second Supp. Letter; Def. Second Supp. Mem.; Bartko Supp. Response; Bartko Supp. Reply.

II. DISCUSSION

A. Law Governing the Assertion of the Privilege Against Self-Incrimination

The Fifth Amendment privilege against self-incrimination states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To prevent the use of compelled testimony in a criminal case, the privilege can be asserted to refrain from compelled testimony "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory . . . ." Kastigar v. United States, 406 U.S. 441, 444-45

8

(1972); accord Higazy v. Templeton, 505 F.3d 161, 170 (2d Cir. 2007). The privilege protects

not only "answers that would in themselves support a conviction under a federal criminal statute

but likewise embraces those which would furnish a link in the chain of evidence needed to

prosecute the claimant for a federal crime." Hoffman v. United States, 341 U.S. 479, 486

(1951). Indeed, even statements consistent with the claimant's innocence may be protected by

the Fifth Amendment. Ohio v. Reiner, 532 U.S. 17, 21 (2001) (per curiam) ("truthful responses

of an innocent witness, as well as those of a wrongdoer, may provide the government with

incriminating evidence from the speaker's own mouth").

The Supreme Court has also noted that "[t]o sustain the privilege, it need only be evident

from the implications of the question, in the setting in which it is asked, that a responsive answer

to the question or an explanation of why it cannot be answered might be dangerous because

injurious disclosure could result." Hoffman, 341 U.S. at 486-87; accord United States v.

Lumpkin, 192 F.3d 280, 285 (2d Cir. 1999). A witness may invoke this privilege even "where

practically there is only a slight possibility of prosecution" without regard to the "practical

possibility that prosecution would result from incriminatory answers." United States v. Miranti,

253 F.2d 135, 139 (2d Cir. 1958).

Certainly, the privilege "protects against real dangers, not remote and speculative

possibilities." Zicarelli v. N.J. State Comm'n Of Investigation, 406 U.S. 472, 478 (1972). When

no possibility of prosecution is "readily apparent," then the witness asserting the privilege bears

the burden of proving that he has "reasonable cause to apprehend that answering the question

will provide the government with evidence to fuel a criminal prosecution." OSRecovery, Inc. v.

One Groupe Int'l, Inc., 262 F. Supp. 2d 302, 306 (S.D.N.Y. 2003) (internal quotation marks and

citations omitted); see also United States v. Edgerton, 734 F.2d 913, 919 (2d Cir. 1984) ("If the

court determines that the incriminatory nature is not readily apparent, the witness then must endeavor to explain how his answer will be incriminatory") (citing In re Morganroth, 718 F.2d 161, 166-67 (6th Cir. 1983)). "This burden forces a witness to come dangerously close to doing that which he is trying to avoid." Edgerton, 734 F.2d at 919. A witness's "sincere belief" that his answers may be incriminating, without more, "is not enough to foreclose his answering or making a disclosure . . . ." N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1356 (2d Cir. 1989) (citing Hoffman, 341 U.S. at 486).

Finally, the Fifth Amendment privilege against self-incrimination "must be accorded liberal construction in favor of the right it was intended to secure." See Hoffman, 341 U.S. at 486 (citation omitted); see also Estate of Fisher v. Comm'r of Internal Revenue, 905 F.2d 645, 648 (2d Cir. 1990) (Fifth Amendment privilege against self-incrimination "must be broadly construed to serve the right it was designed to protect") (citations omitted).

Ordinarily, the procedure by which a deponent seeks to assert his privilege against self-incrimination "is for the deponent to attend the deposition, to be sworn under oath, and to answer those questions he can without risking self-incrimination." Moll v. U.S. Life Title Ins. Co. of N.Y., 113 F.R.D. 625, 628-29 (S.D.N.Y. 1987) (citation omitted). The deposing party may thereafter move to compel the witness to answer the questions for which the privilege was asserted. See generally OSRecovery, Inc., 262 F. Supp. 2d at 304-05. However, courts have also determined whether a claimant may invoke the privilege against self-incrimination before the deposition at which the witness plans to assert the privilege. See, e.g., Slainte Invs. Ltd. P'ship v. Jeffrey, 2015 WL 1445331, at *2 (D. Conn. Mar. 30, 2015) ("In the case at bar, Defendant has sought permission from the Court to invoke the Fifth Amendment privilege in his deposition testimony"); U.S. Sec. & Exch. Comm. v. Militano, 1991 WL 270116, at *1

(S.D.N.Y. Dec. 9, 1991) (resolving motion to compel witnesses to testify prior to deposition on the ground that witnesses stated their intention to invoke the privilege against self-incrimination at their depositions). Inasmuch as Bartko has made the request for a determination and, given that he is in prison, is acting pro se, and is not easily deposed, we accept the invitation of all parties to resolve whatever privilege issues may be resolved on the current record.[3]

B. Analysis

1. Whether Bartko May Assert His Privilege Against Self-Incrimination to Refrain from Answering Any Question Outside of His Proposed Topics

Bartko asserts that his Fifth Amendment privilege against self-incrimination allows him to refrain from answering all questions at his deposition "[e]xcept for [questions pertaining to] general biographical information, Bartko's relationship with Mr. Pence or any other former client named in the SEC Complaint, and the identity of such former clients . . . ." Bartko Mem. at 20.

A court should not accept a defendant's "blanket assertion of a fifth amendment privilege," and must instead "undertake a particularized inquiry to determine whether the [fifth amendment] assertion was founded on a reasonable fear of prosecution . . . ." United States v. Bowe, 698 F.2d 560, 566 (2d Cir. 1983) (internal quotation marks omitted) (quoting United States v. Zappola, 646 F.2d 48, 53 (2d Cir. 1981)). Because Bartko's assertion that he need not

---

[3] We note that had the SEC and Pence made a motion to compel Bartko's compliance with the subpoena, Rule 45 would have required that the motion be brought in the Middle District of Florida, where Bartko is currently incarcerated. Rule 45 does not specifically address the proper court to adjudicate a request for a ruling by a deponent in advance of the deposition. But in light of the liberal transfer policy now reflected in Rule 45, see Fed. R. Civ. P. 45(f), the fact that Bartko himself sought a ruling from this Court on the privilege question, and the fact that all other parties have sought to raise the issue with this Court, we deem Bartko's request to have been properly raised in this district.

answer questions on every possible topic save the limited topics he has proposed fails to engage in the "particularized inquiry" required by case law, we reject his request.

### 2. Whether Bartko May Assert His Privilege Against Self-Incrimination to Refrain from Being Deposed About Matters Relating to His Prior Conviction and Related Matters

Bartko offers an unusual reason for why he should not have to be deposed regarding his prior conviction: that answering such questions truthfully could subject him to "perjury charges" because neither the sentencing judge nor the Government found his prior trial testimony to be truthful. See Bartko Mem. at 13. Normally, truthful testimony exposes prior testimony as perjurious where the two sets of testimony differ. See, e.g., United States v. Housand, 550 F.2d 818, 823 (2d Cir. 1977) (a witness testifying truthfully in a manner that contradicts prior testimony given under a grant of immunity "is a reasonable cause for apprehension, and supports the claim of privilege"). Here, Bartko believes that the testimony he plans to offer at his deposition will be disbelieved by future prosecutors and that they may bring perjury charges against him. While courts have not typically accepted such arguments as a basis for invoking the Fifth Amendment privilege, see, e.g., United States v. Allmon, 594 F.3d 981, 987 (8th Cir. 2010), it is not necessary to reach this question because there is a much more obvious basis on which to uphold Bartko's claim of privilege: namely, that any deposition testimony he may give could be used against him if his conviction is vacated and he is retried.

Bartko has a pending motion to vacate his conviction under 28 U.S.C. § 2255. See Bartko Mot. to Vacate. The Supreme Court has held that the privilege applies up until the point "the sentence has been fixed and the judgment of conviction has become final." Mitchell v. United States, 526 U.S. 314, 326 (1999) (citation omitted). It appears settled that a conviction is not "final" for this purpose if an appeal is pending. See, e.g., Sterling Nat'l Bank v. A-1 Hotels

Int'l, Inc., 2004 WL 1418201, at *1 (S.D.N.Y. June 23, 2004) (collecting cases and noting that "after sentence has been imposed, [the witness's] privilege assertion remains reasonable, for he has appealed his conviction and thus remains in jeopardy insofar as any testimony he offers in these proceedings could potentially prejudice him either in connection with his appeal or at a possible retrial"). There appears to be no case law, however, that directly addresses the question of whether a motion to vacate or other collateral attack on a conviction is sufficient to find that the defendant's testimony as to matters relating to the conviction should not be compelled. We have located dicta that supports this notion. See Zaire v. West, 2008 WL 4852677, at *1 (W.D.N.Y Nov. 6, 2008) (no further incrimination was possible after petitioner's "appeal and right to bring collateral proceedings have long since concluded"); Martin v. Dowling, 2006 WL 2711643, at *5 (D.N.J. Sept. 21, 2006) (rejecting plaintiff's assertion of privilege against self-incrimination when direct appeals and "federal collateral challenges" were completed prior to parole proceeding). And given the important interests at stake, we find that the pendency of a timely-filed undecided motion under 28 U.S.C. § 2255 is sufficient for us to believe that it is not "remote and speculative" that Bartko's conviction could be overturned. Notably, a motion to vacate under 28 U.S.C. § 2255 is the only mechanism by which some attacks on a federal conviction may be raised — such as claims of failure to produce exculpatory material or discovery materials for which there is no record at the time of the appeal, which are the very claims raised by Bartko in his motion to vacate.

Accordingly, we conclude that Bartko has reasonable cause to apprehend that deposition questions relating to the facts underlying his conviction and related matters might incriminate him if answered. Bartko may therefore assert his Fifth Amendment privilege against self-

incrimination to refrain from answering such questions.[4]

This ruling applies only to the facts underlying his conviction. Thus, the SEC correctly notes that it could ask questions about matters incident to his conviction, such as: "(1) [that] he is a convicted felon; (2) his current status as an incarcerated prisoner in FCI Coleman; (3) the date of his arrest, indictment, and conviction; (4) the nature of the criminal charges he was convicted of; (5) whether he testified on his own behalf at his trial; and (6) whether he made certain statements at his trial and/or sentencing." See SEC Mem. at 6-7.[5]

### 3. Whether Bartko Can Invoke His Privilege Against Self-Incrimination to Refrain from Answering Deposition Questions Relating to His Involvement With Pence, PSQ, and GEE

The central issue in this dispute is whether Bartko may assert the privilege to avoid answering questions about the scheme alleged by the SEC in this case involving Pence, PSQ and GEE. Bartko states that he represented "one or more of the alleged co-conspirators[,]" Bartko Mem. at 14, and his deposition testimony might result in his being charged in this "long-running and possibly continuing criminal conspiracy," id. at 17. The SEC concedes that Bartko "may have a valid basis under the Fifth Amendment" not to answer questions regarding the circumstances of his interactions with Pence and PSQ in 2009 and 2010. SEC Mem. at 14. Pence, by contrast, argues that Bartko has not demonstrated how such testimony might

---

[4] The SEC states that Bartko "arguably" waived his privilege against self-incrimination by reciting his version of the facts in the instant motion and in his direct appeal and motion to vacate. See SEC Mem. at 6 n.3. Given its hedging language, and its inclusion of this statement in a footnote, we do not view the SEC as raising this issue. See S.D.N.Y. Local Civil Rule 7.1 (requiring a memorandum of law to contain an "appropriate heading[]" for each "issue[] to be determined").

[5] However, given that these are matters of public record, the Court wonders why there would be any point in deposing Bartko on them.

incriminate him, and in any event Bartko's prosecution would be time-barred by the applicable statute of limitations. See Def. Mem. at 5-8; Def. First Supp. Mem. at 4-9. We address both issues next.

a.  Whether the Testimony is Incriminatory

As already discussed, Bartko purportedly represented Pence and PSQ in the acquisition of GEE, including helping to prepare PSQ's Tender Offer Statement. See Def. First Supp. Mem. at 3, 6. During PSQ's acquisition of GEE, the SEC claims that Pence misrepresented the true source of PSQ's funds in acquiring GEE. See Compl. ¶¶ 28-29. Accordingly, the SEC and Pence both seek to question Bartko regarding his role in representing PSQ during this acquisition. See SEC Proposed Topics; Pence Proposed Topics. Depending on Bartko's role, questions regarding this issue may reveal that Bartko knowingly helped Pence misrepresent the source of PSQ's funding in the Tender Offer Statement. More obviously, however, Bartko's deposition regarding these topics will allow the government to establish that Bartko was involved in preparing documents that the SEC alleges contained misrepresentations and thus that Bartko "cause[d] to be transmitted by means of a wire" a "false . . . representation . . . for the purpose of executing [a] scheme or artifice to defraud." 18 U.S.C. § 1343.

Additionally, the parties both seek to question Bartko regarding his actions as GEE's general counsel. See SEC Proposed Topics; Pence Proposed Topics. Pence notes that Bartko helped prepare GEE's 10-K that allegedly misrepresented the whereabouts of GEE's $2.3 million. See Def. First Supp. Mem. at 6, 8-9. The misrepresentations contained in this 10-K form the basis of some of the SEC's allegations against Pence. See Compl. ¶ 1. Moreover, the SEC also alleges that Bartko explained to GEE's outside auditors "what allegedly happened to the company's $2.3 million at PAB in a December 18, 2009 letter." See SEC First Supp. Letter

15

at 3; Gregory Bartko's Letter to Sean Henaghan (annexed as Ex. E to SEC First Supp. Letter). Pence's allegedly misleading representations and omissions to the audit committee and shareholders regarding the investment and whereabouts of this $2.3 million are at the core of the SEC's allegations against Pence.  <u>See</u> Compl. ¶¶ 1, 6, 48, 51, 53, 57, 63, 65.  Bartko's answers to questions on these issues will at the very least provide the government with Bartko's own testimony that he repeated statements that were later deemed misleading, and may perhaps reveal more than that.

Pence nevertheless asserts that Bartko has failed to "explain how his answer will be incriminatory."  <u>See</u> Def. Mem. at 4 (quoting <u>Edgerton</u>, 734 F.2d at 919).  But Bartko is not required to "prove the hazard in the sense in which a claim is usually required to be established in court."  <u>Hoffman</u>, 341 U.S. at 486; <u>accord</u> <u>N.Y. State Nat'l Org. for Women</u>, 886 F.2d at 1356.  Instead, Bartko need only demonstrate "a possibility of incrimination."  <u>N.Y. State Nat'l Org. for Women</u>, 886 F.2d at 1357.  Such a possibility is clearly present here.  Even apart from the showing made by Bartko, the SEC points out that lawyers from Bartko's firm provided advice to Pence regarding the "investment" of GEE's $2.3 million.  <u>See</u> SEC First Supp. Mem. at 2; Email from Stephen Pence to the Law Office of Gregory Bartko (annexed as Ex. C to SEC First Supp. Mem.).  Requiring Bartko to make a stronger showing that his answers might incriminate him would improperly compel Bartko "to surrender the very protection which the privilege is designed to guarantee."  <u>Hoffman</u>, 341 U.S. at 486.

### b.  Statute of Limitations

Pence separately argues that Bartko may not assert his privilege against self-incrimination to refrain from answering deposition questions regarding the scheme because the relevant statutes of limitations bar Bartko's prosecution.  Def. Mem. at 5-9.

Because a witness's fear of prosecution must be "reasonable" to justify asserting the privilege against self-incrimination, a witness may not assert the privilege with respect to incriminating testimony for which "an absolute bar to subsequent prosecution" exists. Estate of Fisher, 905 F.2d at 651 (citations omitted); see also Miranti, 253 F.2d at 138-39, 141 (privilege against self-incrimination was properly invoked where subsequent prosecution was not "absolutely barred"). Accordingly, "the Fifth Amendment's privilege against self-incrimination does not apply after the relevant limitations period has expired." Stogner v. California, 539 U.S. 607, 620 (2003) (citing Brown v. Walker, 161 U.S. 591, 597-98 (1896)); see also United States v. Blumberg, 787 F. Supp. 67, 70 (S.D.N.Y. 1992) (rejecting defendant's assertion of privilege because defendant had "no real fear of prosecution since applicable statute[s] of limitations have run"). However, a witness may assert his privilege against self-incrimination when "it cannot be concluded with certainty that all relevant statute[s] of limitations have run." ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse, 110 F.R.D. 278, 283 (S.D.N.Y. 1986).

In the initial round of briefing, Pence assumed that the governing statute of limitations was the catch-all federal five-year period, see 18 U.S.C. § 3282, and argued that all the alleged activity occurred prior to August 2012, see Def. Mem. at 6. However, the statute of limitations for conspiracy to commit mail or wire fraud may extend to ten years if the offense "affects a financial institution." 18 U.S.C. § 3293(2). A "financial institution" in 18 U.S.C. § 3293(2) is defined, inter alia, as "an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act)." 18 U.S.C. § 20(1). For section 3293(2) to apply, the effect on the financial institution must be "sufficiently direct." United States v. Heinz, 790 F.3d 365, 367 (2d Cir. 2015) (per curiam) (internal quotation marks and citation omitted). Nonetheless, "the Second Circuit has broadly interpreted the statute's requirement that an offense 'affect' a

financial institution." United States v. Ghavami, 2012 WL 2878126, at *5 (S.D.N.Y. July 13, 2012) (citing United States v. Bouyea, 152 F.3d 192, 195 (2d Cir. 1998) (per curiam)), aff'd sub nom. Heinz, 790 F.3d 365. Accordingly, mail or wire fraud affects a financial institution "where it exposes such institution to a new or increased risk of loss, even if there is no actual or net loss." Ghavami, 2012 WL 2878126, at *6. This extended statute of limitations may apply even when the financial institution is not the victim or object of the fraud, but is itself "an active participant in the fraud." United States v. Ohle, 678 F. Supp. 2d 215, 229 (S.D.N.Y. 2010).

Here, there appears to have been a scheme to defraud GEE and its investors that affected PAB. By virtue of Pence's concealment of Huff's role in PSQ, Huff was allegedly able to gain control of GEE. See Compl. ¶¶ 26-28. Huff allegedly used PAB to conduct banking for business entities with which he was affiliated, and PAB's president, Antonucci, was an alleged co-conspirator of Huff's. See id. ¶¶ 4, 18. PAB was involved in this scheme insofar as GEE's cash assets were put in a PAB account, and were then allegedly transferred to Park Avenue Insurance, another entity associated with Antonucci, without GEE's authorization. See id. ¶¶ 35-38. Based on these allegations, PAB, like the bank in Ohle, 678 F. Supp. 2d at 229, may have acted as a participant in the scheme to defraud GEE and deprive it of substantially all of its cash assets. As a co-conspirator, PAB would have thus been exposed to an increased risk of loss in the form of, inter alia, potential liability to GEE and its investors, or to the SEC through a civil action like this one. Thus, this fraud may have affected a financial institution within the meaning of 18 U.S.C. § 3293(2). See Ghavami, 2012 WL 2878126, at *6. Indeed, not only does the SEC itself concede that the ten-year statute of limitations may apply, see SEC First Supp. Mem. at 3, it points out that another ten-year statute of limitations may also apply — specifically, the statute criminalizing fraud and embezzlement offenses committed by bank

officers, directors or employees such as Antonucci, as well as conspiracies to commit such offenses, see id. at 3 n.1 (citing 18 U.S.C. §§ 656, 3293(1)).

Pence argues that the ten-year statute of limitations could not apply to any potential prosecution of Bartko because "GEE is not a bank and the securities filings that Mr. Bartko prepared for Mr. Pence and PSQ had nothing to do with GEE's banking at PAB or elsewhere." See Def. Second Supp. Mem. at 9. Similarly, Pence argues that any alleged misrepresentations Mr. Bartko may have made regarding the $2.3 million withdrawn from GEE's PAB account were made "after the fact" and do not "logically place Mr. Bartko in a conspiracy that affected PAB." See Def. First Supp. Mem. at 8. We reject this argument because "the extended limitations provision requires only that the offense — meaning the entire scheme — affect the financial institution, not that individual uses of the wire do so." See United States v. Rubin/Chambers, Dunhill Ins. Servs., 831 F. Supp. 2d 779, 783 (S.D.N.Y. 2011) (internal quotation marks and alterations omitted) (quoting United States v. Martinez, 172 F.3d 39 (2d Cir. 1999) (summary order)). Thus "the only necessary evidence is that evidence sufficient to connect the purported effect to the fraudulent scheme as a whole rather than to particular overt acts." Id. (citing Martinez, 172 F.3d at 39). The securities filings Bartko helped to prepare can be placed in a broader scheme to, as Bartko puts it, "loot[] upwards of $2.3 million in cash" from GEE's PAB account. Bartko Mem. at 14. When so viewed, questions relating to Bartko's role in preparing these securities filings may reveal information relating to his role in a scheme between Pence, Huff, and Antonucci to defraud GEE and its investors that affected PAB.

Pence's claim that these representations may have been only "tangentially related to PAB," see Def. First Supp. Mem. at 8, is not enough for us to conclude "with certainty" that the statute of limitations does not apply. ACLI Int'l Commodity Servs., Inc., 110 F.R.D. at 283. As

already noted, the financial institution need not be the victim or object of the fraud for section 3293(2), provided the scheme has a "sufficiently direct" effect on the financial institution. Heinz, 790 F.3d at 367. Insofar as PAB may have been a co-conspirator in this scheme, the increased risk of loss it faced as a result of this scheme was a sufficiently direct effect. Ghavami, 2012 WL 2878126, at *6.

Pence points out that "those who were believed to be responsible [for this scheme] were prosecuted for their actions several years ago, and Mr. Bartko was not among them." Def. First Supp. Mem. at 7 n.5. However, in assessing whether a claimant's assertion of his privilege against self-incrimination is proper, a court does not consider the "practical possibility that prosecution would result from incriminatory answers." Miranti, 253 F.2d at 139. Bartko's answer to deposition questions relating to his representation of PSQ, Pence, and GEE would furnish a link in a prosecution for a conspiracy to commit wire fraud that affected PAB. "In sum, it cannot be concluded with certainty that all relevant statute[s] of limitations have run." ACLI Int'l Commodity Servs., Inc., 110 F.R.D. at 283. Therefore, Bartko may assert his privilege against self-incrimination to refrain from answering questions relating to the scheme alleged in the complaint.

### 4. Whether Bartko May Refrain From Answering Deposition Questions on Other Grounds

In light of this ruling, it does not appear necessary to reach the question of whether Bartko may assert his privilege against self-incrimination to refuse to answer questions relating to his representation of PSQ and Pence when doing so may provide the government with evidence of his prior bad acts. See SEC Mem. at 13-14.

Bartko also suggests that he wishes to assert his privilege against self-incrimination to

prevent the SEC from deposing him about his views of federal agencies and his prior lawsuits against such agencies. See Bartko Mem. at 15. However, Bartko fails to identify any way in which answers to these questions might be deemed incriminating for Fifth Amendment purposes. Accordingly, Bartko may not assert his privilege to refrain from answering questions relating to his views of federal agencies and his prior lawsuits against those agencies.[6]

## III. SERVICE OF SUBPOENA

Bartko argues that he was not properly served with a subpoena ad testificandum pursuant to Fed. R. Civ. P. 45, which he contends requires personal service. See Bartko Mem. at 18-19. Bartko has not described the means by which personal service may be effectuated upon him at his current correctional institution. In light of the fact that Bartko has not claimed that personal service is possible, the Court finds that the means of service used by the parties, consisting of certified mail, see Def. Mem. at 10; USPS Tracking results (annexed as Ex. C to Lewis Decl.), that was actually received by Bartko, is sufficient. See Sec. & Exch. Comm'n v. Pence, 2017 WL 4326077, at *4 (S.D.N.Y. Sept. 28, 2017) (Rule 45 permits service "by means other than personal service under appropriate circumstances.").

## IV. CONCLUSION

For the foregoing reasons, Bartko's motion to invoke his Fifth Amendment privilege against self-incrimination to refrain from answering questions at his deposition (Docket # 55) is

---

[6] In his memorandum in support of this motion, Bartko claims that the attorney-client privilege and work-product doctrine might prevent him from divulging some of the information sought in this deposition. See Bartko Mem. at 2. This Court has previously addressed the applicability of the attorney-client privilege to Bartko's deposition. See Leave Memo Endorsement; Memo Endorsement of Letter from Alan S. Lewis to the Court, filed July 31, 2017 (Docket #54), at 2. The invocation of work-product protection is rejected because Bartko's memorandum addresses it in only the most cursory manner and thus provides no basis for upholding his invocation of that privilege.

granted in part and denied in part as set forth above.

SO ORDERED.

Dated: October 31, 2017
     New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy mailed to:

Gregory Bartko
#61509-019
FCI Coleman Low
Federal Correctional  Institution PO Box 1031
Coleman, FL 33521